## STREET RAILWAY FARES WITHIN THE CORPORATE LIMITS OF CINCINNATI.

Decided, August 9, 1912.

THE CITY OF CINCINNATI v. THE CINCINNATI, GEORGETOWN & PORTSMOUTH RAILROAD COMPANY; AND THE CITY OF CINCINNATI v. THE INTERURBAN RAILWAY & TERMINAL COMPANY.

Friday, August 9, 1912.

*Street Railways—As to the Right to Collect Double Fares for a Single Continuous Journey in the Same General Direction within the Corporate Limits of Cincinnati—Injunction—Sections 9120 et seq.*

The court is of the opinion that a double street railway fare—one on the track of an interurban road, and a second fare on the track of the Cincinnati Street Railway Company—can not be legally collected for a single continuous journey in the same general direction within the corporate limits of the city of Cincinnati; but inasmuch as it is a matter that is in some doubt, the court declines to grant an injunction against the collection of such double fares, but leaves the status as it is until the law can be fully determined.

*Alfred Bettman,* City Solicitor, for plaintiff.
*Frank F. Dinsmore,* contra.

SWING, J.

I am asked in the above two cases to enjoin the defendant companies named—interurban electric railway companies operated in Cincinnati—from collecting two fares of five cents each within the city limits. I have heard the testimony and have studied the law with great care aided by the able briefs of counsel. I find the main question in the cases, viz.: the power of the companies under the statutes of the state and ordinances of the city to charge more than one fare, a fare of five cents, within the city limits, most difficult.

The sections of the statutes applicable to the case are in the General Code, Sections 9120 and 9133. It is claimed by the

plaintiff that these cases come under one or the other of these sections.

The Supreme Court, in the case of *Railway Company* v. *Cincinnati,* 75 O. S., 196, referring to these statutes by their former numbers, say:

"The occasion for both of these acts is not apparent, but they do not necessarily conflict. It may be that the one or the other applies accordingly as recourse has been had to it's authority."

I am of the opinion that this statement is applicable in the present cases as to both defendant companies.

The case in 75 O. S., 196, involved a question as to transfers, and that was the question decided. It is a different question from that involved in these cases. But the court say further:

"However, if the later act applies" (Section 9133) "there is nothing in it requiring transfers. The provision is that the fare charged for transporting passengers in the municipality shall not be greater than that fixed in the franchise of the street railway company.

"*This is a limitation upon the fare the interurban company may charge* for the service it is authorized to render and not a requirement that it shall provide or pay for additional transportation."

Section 9120, General Code, is as follows:

"Such companies may lease, purchase or make traffic arrangements with any other street railway company as to so much of its tracks and other property as is necessary or desirable to enable them to enter or pass through a city or village, upon the terms and conditions applicable to other street railways.

"Any existing street railway company, owning or operating a road shall receive the cars, freight, packages or passengers of any other road *upon the same terms and conditions* as they carry for the general public."

Section 9133, General Code, is as follows:

"The fare charged by such railway company for transporting passengers within such municipal corporation or corporations shall not be greater than that fixed in the franchise or franchises held or owned by such street railway company or companies."

The passenger fare fixed for the Cincinnati Street Railway Company is five cents. It is over the tracks of that company that the cars of the defendant companies pass.

But the defendant companies constructed their own tracks outside the city limits and up to the limits where they connected with the tracks of the street railway companies and were entitled to charge a separate fare on their own tracks so constructed. Subsequently the corporate limits of the city were extended so as to include a portion of their tracks, so constructed, and the question is whether they can continue to charge a separate fare on their own tracks, so constructed, within the city limits, making two fares collected by them within the city limits, one on their tracks, and one on the tracks of the Cincinnati Street Railway Company—the latter now operated by the Cincinnati Traction Company. This question is not decided by our Supreme Court in 75 O. S., 196.

Speaking of the words "the same terms and conditions," the court say:

"The words 'terms and conditions' appear in many, if not all, of the statutes delegating to municipalities the authority to grant to street railroads the right to use the streets, and perhaps in all ordinances making the grant, *and yet it can not be said that they are used with a definite legal signification.*"

Then the court cite several acts and ordinances in which the words are used, and say on page 214:

"It is not necessary in the present case to determine what the words 'the same terms and conditions applicable to other street railroads' do mean, and etc., *and in view of the state of the art and the importance of these questions to the public and to the street railroad companies, it is inexpedient to do so.*"

But our Supreme Court in 75 O. S., 196, say, page 209, that the words "terms and conditions" in the statutes do not refer to "the terms and conditions" provided in a particular franchise of any particular street railway company, but rather to the *general terms and conditions* applicable to street railroads in the city generally.

They say "Section 4 of the act of May 17th, 1894" (one of the sections now in the General Code) "provides that the agreement may be made upon the *same terms and conditions applicable* to other street railroads.   Not upon the terms and conditions of the grant to the company owning the tracks, but upon the terms and conditions applicable to street railroads generally.   So that, while the rate of fare to be charged by a street railway *may be made one of the terms of the grant to it* of the right to occupy the street, *it could not be one of the terms and conditions applica- to street railroads generally.*"

So the rate of fare fixed in the franchise of the Cincinnati Street Railway Company does not govern in this case.   This is conceded by counsel for the city in his brief.   But it is claimed by counsel for the city that in 1902 when the defendant companies made their arrangements with the Cincinnati Street Railway Company for the use of its tracks in the city, and before the city limits were extended, there was a general ordinance of the city limiting street railroad fares to five cents.

He has introduced in evidence an ordinance passed July 1st, 1859, Section 8 of which is as follows:

"No more than five cents to be charged for fare; and provided that any such company or individual shall not charge more than five cents for each passenger on any of said roads."

Also "a new general ordinance" passed February 7th, 1879, as follows:

"In no event shall the rates of fare be increased beyond the rates specified in existing contract, but shall remain the same except as herein modified."

But these general provisions were omitted from the ordinances as codified in April, 1911, and as counsel for the city says, "To-day there is no term relating to rate of fare in the general street railway ordinance or ordinances of Cincinnati."

But it is claimed by counsel for the city that, these general ordinances having been in effect when defendant companies entered the city, and when they made their arrangements with the Cincinnati Traction Company by virtue of these ordinances and

their traffic agreement and Section 9120, General Code, "They were bound to carry passengers within the city limits for five cents."

Many other contentions are made as to these general ordinances, such as that they did not contemplate interurban roads, unknown when they were enacted, operating cars on their own tracks then outside of the city limits, as in this case, and that they do not apply to existing conditions at this time, and that they were subsequently practically held invalid by our Supreme Court. And numerous other contentions are made.

I have set forth enough to show the extreme difficulty of the case on what I deem the main question. I think it quite impossible for any court but one having final jurisdiction to authoritatively and satisfactorily determine the question. I think this may fairly be said to be indicated by the remarks of our Supreme Court quoted, in 75 O. S., 196.

I will say that I am inclined to think, considering the whole matter, that the contentions of the city are probably correct. But it is said in American & English Encyclopedia of Law, Volume 16, pages 358 and 359:

"An injunction will not usually be granted where the complainant's right is doubtful. When the principles of law on which rights are disputed will admit of doubt, a court of equity although satisfied as to what is the correct conclusion of law upon the facts, will not, without a decision of the courts of law, establishing such principles, grant an injunction. But where the facts upon which the right depends are established or admitted, and the principles of law which on these facts would give the right are settled and established, a court of equity may apply the principles as settled by the court of law to the facts, and allow an injunction."

In these cases it can not be said that the principles of law which would give the right are settled and established until determined finally in the courts. The rule quoted is not confined to temporary injunctions; it applies as well to perpetual injunctions. But an injunction in these cases by this court would really be much in the nature of a temporary injunction, and it could be vacated by appeal or otherwise stayed.

In the case of *Spangler* v. *City of Cleveland,* 43 O. S., 526, the Supreme Court say, in the opinion, page 526:

"*For a perpetual injunction* the courts require that there shall be no doubt in the case, and that the plaintiff must make out a clear and unexceptionable right.   Dan. Ch., 1681."

Also:

"Courts will not exercise this necessary authority *when the right is doubtful* or the facts not definitely ascertained.   *Burnham* v. *Kemplon,* 44 N. H., 92."

Also:

"The right must be clear.   *Bonaparte* v. *Camden & Amboy Railroad Company,* 1 Bald., 218."

In view of "the importance of the questions," as our Supreme Court has said, and the uncertainty as to the law upon the main question, viz.: the question of law as to whether or not the defendant companies are entitled to charge two fares, I think it would be the part of wisdom and indeed my duty under the authorities to leave the status as it is until the law can be finally determined.

For these reasons I will refuse the injunctions and let the cases proceed to the higher courts.

I think I should add that the contentions of defendant companies that they are protected by their original franchises fixing a rate of fare outside the city limits as they then were, and that the granting of the injunction would compel them to operate at a loss within the city, and so be confiscatory, do not seem to me to be good defenses in these cases.